IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 22, 2018

## STATE OF TENNESSEE v. THOMAS ALLEN STRINGER

**Appeal from the Criminal Court for Sullivan County**
**No. S64667   James F. Goodwin, Judge**

_____

### No. E2017-01614-CCA-R3-CD

_____

Defendant, Thomas Allen Stringer, was indicted for two counts of aggravated assault and one count of felony evading arrest. In a superseding presentment, Defendant was charged with two counts of aggravated assault, felony evading arrest, and possession of a firearm by a convicted felon. Following a jury trial, Defendant was convicted of two counts of misdemeanor assault and one count of felony evading arrest. The jury found Defendant not guilty of possession of a firearm by a convicted felon. Following a sentencing hearing, the trial court sentenced Defendant to three years for his felony evading arrest conviction and 11 months and 29 days for each of his assault convictions. The trial court ordered all of Defendant's sentences to run consecutive to each other. The court ordered Defendant to serve three years, 11 months, and 29 days incarcerated and the remaining 11 months and 29 days to be served on Community Corrections. In this appeal as of right, Defendant contends that his sentence is excessive and the trial court abused its discretion by imposing consecutive sentencing. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Stephen M. Wallace, District Public Defender; Ashley D. Boyer and W. Andrew Kennedy, Assistant Public Defenders, Blountville, Tennessee, for the appellant, Thomas Allen Stringer.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Barry Staubus, District Attorney General; and Teresa A. Nelson, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

*Facts*

On January 11, 2015, Matthew Harrison, of the Sullivan County Sheriff's Office, attempted to serve an arrest warrant for Kendra Poe. He had received information that Ms. Poe "may be traveling with several individuals in a red Chevy S10 pickup truck." He also had information that Ms. Poe had previously been seen that day at 1132 Ingle Street in Kingsport, Tennessee. Officer Harrison drove past the Ingle Street address at about 3:00 p.m. and saw a red truck in the driveway. He and another officer, Burk Murray, parked in separate locations away from the residence to observe and wait for the occupants to exit the residence and leave in the vehicle.

Officer Harrison "got a notification from Officer Murray that the vehicle was coming out. He said he wasn't able to identify who got in the vehicle from where he was sitting." Officer Harrison then saw the red truck come to a stop sign at an intersection. He "could tell there was [sic] three bodies in the vehicle," but he could not identify the individuals because the windows were tinted. Officer Harrison followed the vehicle. He testified,

> When I got behind the vehicle, it had merged into the left lane. [The] [v]ehicle then made a really sharp, abrupt turn onto Farragut Avenue.
>
> . . . .
>
> I followed behind the vehicle. That point in time me and Officer Murray were in radio contact with each other. And the individuals that we had identified to be in the vehicle, we knew that both of those did not have a driver's license.
>
> So I was continuing to follow the vehicle to see if I could identify it. It's a dead end street. As I was going on up the street, that's when I activated my patrol lights. [I] followed behind the vehicle for just a little ways until I could see that [I] didn't feel like they were going to stop. And then I turned on my siren and followed behind the vehicle.

Officer Harrison testified that Farragut Avenue is in a residential neighborhood, and it dead-ends into a cul-de-sac. The red truck pulled into a driveway at the last house on the left before the cul-de-sac. Officer Harrison pulled in behind the truck. He approached the driver's side. Defendant was in the driver's seat, and the window was open. Officer Harrison spoke to Defendant and said "something to the tune of, 'Hey,

how are you doing?' or 'How you doing today?'" Officer Harrison testified that Defendant put the vehicle in reverse. Officer Harrison "drew [his] service pistol and took one step back from the vehicle and gave an instruction for him to stop the car." Defendant replied, "Yeah, right." Defendant then turned the steering wheel to the right and began backing up. Officer Harrison testified, "as he was doing so, the front of the vehicle brushed up against my pants . . . ." Officer Harrison "was backstepping" to get out of the way of the vehicle. Defendant then drove away. Officer Harrison saw Officer Murray's patrol car, and Officer Harrison pursued the vehicle on foot. He testified,

> I was running down the middle of the road. The next thing, like I said, I seen [sic] the – the cruiser coming up the road with its blue lights on. And basically both vehicles come to a stop, you know. Both vehicles stopped in the middle of the road. And so I continued to run towards the vehicle, you know.

> And at that point I get, you know, close distance to the vehicle. The reverse lights come on. The vehicle comes back at me again with the tires spinning, squealing. Comes straight back at me again.

> . . . .

> At that point the vehicle was coming back at me. [I] didn't know what to do, so I jumped to the left. The vehicle probably got within a foot of me when I jumped to the left, jumped up on the sidewalk to get away from the vehicle because, you know, it's not a two-laned road, it's just a –

> . . . .

> – residential neighborhood road. So it's not two lanes. It's not, you know, going two lanes, however you describe that. It's just a one-lane road[.]

> So I was able, when I jumped to the left of myself, to get up on the sidewalk and I got behind the telephone pole.

Officer Harrison testified that he heard a loud "boom" and saw that the red truck had collided with Officer Murray's vehicle. Officer Harrison approached Defendant's vehicle with his weapon drawn. Defendant exited the vehicle and fled on foot. Officer Harrison pursued Defendant for "three or four blocks." Defendant jumped over a retaining wall, and Officer Harrison saw that Defendant had "a black semiautomatic

pistol in the back – small of his back." Officer Harrison lost track of Defendant. Other officers and a K9 unit were called to assist in locating Defendant. Defendant was apprehended in the early morning hours the following day.

Officer Burk Murray, of the Sullivan County Sheriff's Office, was working with Officer Harrison on January 11, 2015. Officer Murray testified that he saw the red truck back out of the driveway and almost hit Officer Harrison. The vehicle "accelerated rapidly" towards Officer Murray's vehicle. Officer Murray testified, "I braced for impact thinking I was going to get hit[, a]nd the vehicle stopped right in front of my car to the point I couldn't see the headlights or the grill of the truck anymore." When the vehicle stopped, Officer Murray saw Officer Harrison "running up behind the vehicle . . . screaming, 'Stop.' He had his pistol drawn." Officer Murray testified, "[a]lmost at the same instant that the vehicle stopped, the vehicle started accelerated backwards. I could hear the tires squealing[, a]nd it was going directly backwards toward Deputy Harrison." Officer Murray testified that he positioned his vehicle to block the roadway "[t]o stop [Defendant's] escape anymore, because I still couldn't see Deputy Harrison. I thought he was either under the truck or being run over." Defendant "put his vehicle back in 'Drive' and was coming forward [ ] to go around [Officer Murray] to the right." Officer Murray testified, "I couldn't get moved far enough to the sideways to block him, and I ran into the driver's – or to the passenger side of his truck." Officer Murray testified, "[a]t that point, I drew my weapon. I was aiming at the driver. And the passenger moved into my field and I couldn't – didn't have a clean shot." Defendant then fled on foot. Officer Murray detained two passengers of the truck, and Officer Harrison pursued Defendant.

Defendant testified on his own behalf. He acknowledged that he had prior convictions in 2005 for misdemeanor theft, aggravated criminal trespass, possession of cocaine for sale or delivery, maintaining a dwelling where controlled substances are used or sold, and vandalism. In 2007, Defendant was convicted in Virginia for possession of burglary tools.

Defendant testified that on January 11, 2015, he was taking some friends home and that he was not familiar with the area. He drove his friend to another friend's house in Kingsport. Defendant testified that the friend in Kingsport "had been in some trouble that morning with the police and was wanting a ride out." Defendant testified, "I told him I'd give him a ride and shake him real quick. It was my daughter's birthday, and I was trying to get to my daughter's birthday that evening."

Defendant testified that he did not see the police behind him until he pulled into the driveway at the end of Farragut. Defendant testified, "I was only supposed to have been taking him a couple of blocks and dropping him off. And I [was] just taking instructions from him." Defendant "was under [the] assumption" that they had passed the

friend's house, and he was "going to turn around and come back down." He testified that he "never even put [his] truck in 'Park,' [he] just put it straight in reverse and started backing out." Defendant testified,

> As I [wa]s putting it in reverse, [his passenger] told [him] there was a cop behind us. And I looked out my side view mirror and I seen [sic] him out in the street. And as I rode out in the street, then he got out of his car with his pistol drawn . . .

Defendant testified, "[a]t that point I was just panicked and I wanted to get away." Defendant testified, "I didn't really know why he was after me." Defendant testified that he "didn't know if [he] had a parole violation or what." He testified that he had "missed all [his] daughter's birthdays all her life, and [he] was trying to make that birthday party." He testified, "I know I hadn't done nothing [sic] wrong. I didn't even understand why – why he had a gun drawn on me. I hadn't done anything." Defendant testified that he drove back down the road, and Officer Murray "was accelerating at [him] really fast and he scared [Defendant]." He testified they almost had a head-on collision, but the vehicles did not make impact. Defendant then attempted to drive around Officer Murray's patrol car. He testified that "Officer Harrison wasn't behind [him] at that point." Defendant testified that he "was just trying to get away." Defendant testified that Officer Murray's patrol car hit the passenger side of his truck, and Defendant exited the truck and fled. Defendant testified that he "was never intending to hurt anyone." He denied having a gun.

### Sentencing hearing

A presentence report was admitted into evidence, and the parties stipulated that Defendant was a Range II multiple offender. Defendant testified at the sentencing hearing. He asked the court to sentence him to "a program." He acknowledged that he had been "in the system" for the past 12 to 13 years. He testified that he had successfully completed "some misdemeanor probation" for a conviction in Virginia, but he acknowledged that he was on parole at the time of the offenses in this case. Defendant testified that he would "[d]efinitely" be interested in going to a rehabilitation facility, in particular the "Hay House." Defendant testified,

> I'm tired of doing what I'm doing. I want to change. I want to do something different. That's . . . .
>
> I'm sick of living the life I've been living. I'm sick – I'm – I'm – I'm tired of being in jail, tired of being in the penitentiary. That's all I know. That's all I've done.

When I got out this last time, I really didn't have nowhere [sic] to go. I was out – I was out on the street beating the bushes. I – I really wasn't even prepared to come out to face what I was facing, really. I thought I was. But when I come [sic] out, the whole world was spinning completely different than when I was ready for it. And I just . . . .

It was real easy. I fell right back into the same thing that I always been doing. And I don't want to do that now. In fact, when I do get – whenever I – whatever time I get now, I – I don't want to really just get released. I'd rather come out in a structured environment, try to come out, you know, with a[n] opportunity to – to turn it around, you know. That's – that's really all I'm asking.

On cross-examination, Defendant acknowledged that he had several misdemeanor convictions in addition to the felony convictions used to determine his sentencing range. He also acknowledged that he had juvenile adjudications that would have been felonies if committed while he was an adult and that he had been charged and adjudicated with escape from a juvenile detention center. Defendant acknowledged that he had been given sentences of probation before and that his probation was revoked following an arrest and conviction in Montgomery County, Virginia. Defendant also acknowledged that he had "got[ten] a couple write[-]ups" while incarcerated.

At the conclusion of the sentencing hearing, the trial court stated that it had considered the evidence presented at the trial and sentencing hearing, the presentence report, the principles of sentencing and arguments made as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence presented as to mitigating and enhancement factors, and any statistical information provided by the Administrative Office of the Courts. The trial court also considered Defendant's testimony and his potential for rehabilitation. The trial court found the following enhancement factors: that Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; that the offense involved more than one victim; that Defendant had previously failed to comply with the conditions of a sentence involving release into the community; that Defendant had no hesitation about committing a crime when the risk to human life was high; and that Defendant committed the offense while on parole for another offense. In mitigation, the trial court found that Defendant had obtained his GED.

Regarding consecutive sentencing, the trial court found that Defendant had an excessive history of criminal activity and that he committed a felony while on parole. The trial court sentenced Defendant to 11 months and 29 days each for his two assault

convictions and three years for felony evading arrest conviction. The court ordered that all of Defendant's sentences run consecutive to each other. Regarding alternative sentencing, the trial court found as follows:

> The Court finds that probation has been repeatedly tried and used, to no avail. [Defendant], because all the evidence the Court's heard and the fact that – the fact that alternative sentencing has been repeatedly tried and failed, [Defendant] is going to have to serve both Counts 3 and 1. So he's going to serve three years plus 11 months, 29 days. Then the Court's going to put him in residential Community Corrections at the Brown Annex on that last 11 months, 29 days, so that he can transition back into society.

The trial court also ordered that Defendant undergo drug and alcohol counseling while on Community Corrections.

*Analysis*

Defendant contends that the trial court abused its discretion by imposing more than the minimum sentences and by ordering the sentences to run consecutively.

Our standard of review of the trial court's sentencing determinations is whether the trial court abused its discretion, and we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10.

With respect to consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least

one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).

Here, the record reflects that the trial court, in sentencing Defendant, considered all appropriate principles set forth in T.C.A. § 40-35-210(b). The court applied several enhancement factors, including Defendant's history of criminal convictions in addition to those necessary to establish the range, Defendant has failed to comply with conditions of a sentence involving release into the community; Defendant had no hesitation about committing a crime when the risk to human life was high; and Defendant was on parole at the time he committed the offense. *See* T.C.A. § 40-35-114(1), (8), (10), (13)(B). The court applied only one mitigating factor, that Defendant had obtained his GED. *See* T.C.A. § 40-35-113(13).

The State concedes that the trial court misapplied enhancement factor (3), that the offense involved more than one victim. Factor (3) cannot be applied to enhance a sentence when a defendant is separately convicted of the offenses committed against each victim. *State v. Freeman*, 943 S.W.2d 25, 31 (Tenn. Crim. App. 1996); *State v. Williamson*, 919 S.W.2d 69, 92 (Tenn. Crim. App. 1995). Because Defendant was convicted of two counts of assault where the officers were separately named as victims, the trial court improperly applied enhancement factor (3). *See State v. Imfeld*, 70 S.W.3d 698, 706 (Tenn. 2002). Accordingly, the trial court erred in this regard.

Defendant's conviction for felony evading arrest is a Class E felony. T.C.A. § 39-16-603(b). As a Range II offender, Defendant's sentencing range was "not less than two (2) nor more than four (4) years." T.C.A. § 40-35-112(b)(5). Defendant's sentence of three years for this offense is the midpoint in the range.

We conclude that the trial court properly sentenced Defendant. The trial court considered the relevant principles and sentenced Defendant to a within range sentence. The evidence presented at trial and during the sentencing hearing supports the trial court's application of enhancement factors, with the exception of enhancement factor (3), that the offense involved more than one victim. While the trial court erred in the misapplication of a single enhancement factor, the misapplication does not void the Defendant's sentence. *See Bise*, 380 S.W.3d at 708. Moreover, in misdemeanor sentencing, the "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998). Thus, the trial court is afforded considerable latitude in misdemeanor sentencing. *See State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). We conclude the trial court did not abuse its discretion by imposing the maximum sentences for each of

the Class A misdemeanor assault convictions.    As such, the Defendant is not entitled to relief on this issue.

The trial court based its imposition of consecutive sentencing on its finding that Defendant "is an offender whose record of criminal activity is extensive" under Tennessee Code Annotated section 40-35-115(2).  Defendant acknowledged his extensive criminal history, and the record supports the trial court's finding.  This finding alone is sufficient to support the imposition of consecutive sentencing.  Defendant is not entitled to relief.

CONCLUSION

Based upon the foregoing analysis, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE